## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| VALERIE S. SCHWOB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-04-736-M |
| | ) | |
| STANDARD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is plaintiff's Motion for Summary Judgment, filed January 18, 2005. On February 11, 2005, defendant filed its response. Also before the Court is defendant's Brief Supporting Its Claim Determination Under ERISA, filed January 17, 2005. On February 11, 2005, plaintiff filed her response.

I.      INTRODUCTION

    A.      The Plan

Defendant issued a group long-term disability policy to Urocor, Inc. to provide long term disability insurance coverage for eligible employees ("Plan"). Plaintiff was an eligible employee under the Plan. The Plan defines disability, in part, as "if, as a result of Physical Disease, Mental Disorder, Injury, or Pregnancy, you are unable to perform with reasonable continuity the material duties of your own occupation." Administrative Record at STND432-00229; STND432-00250.[1] The Plan defines Physical Disease as "a physical disease entity or process that produces structural or functional changes in your body as diagnosed by a Physician." Administrative Record at STND432-00229.

_____

[1] All references in this Order to the Administrative Record will be cited as "Administrative Record at STND432-____."

The Plan, also, however, contains a mental disorder limitation.  This limitation provides: "Payment of LTD Benefits is limited to 24 months for each period of continuous Disability caused or contributed to by a Mental Disorder."  Administrative Record at STND432-00229; STND432-00257.  Mental Disorder is defined as:

> any mental, emotional, behavioral, psychological, personality, cognitive, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome, regardless of cause, including any biological or biochemical disorder or imbalance of the brain.  Mental Disorder includes, but is not limited to, bipolar affective disorder, organic brain syndrome, schizophrenia, psychotic illness, manic depressive illness, depression and depressive disorders, anxiety and anxiety disorders.

Administrative Record at STND432-00230.

B.    Plaintiff's Medical History

In May 1987, plaintiff had a tick exposure while visiting a park in Pennsylvania. Plaintiff was diagnosed with Lyme disease[2] and co-infection with babesiosis in 1989.  Plaintiff has tested both positive and negative for Lyme disease on various laboratory tests for the disease.[3] Additionally, plaintiff has had some abnormal brain scans and has had lumbar puncture tests with elevated opening pressures.  Further, from 1989 to present, plaintiff received numerous courses of intravenous and oral antibiotics to treat Lyme disease.  Plaintiff has also been diagnosed with major depressive disorder and has a history of recurrent depression and psychiatric hospitalization.

_____

[2]There are, however, various notes in plaintiff's medical records doubting the accuracy of the Lyme disease diagnosis.

[3]There is no test currently commercially available that can positively diagnose Lyme disease, and there is no test that indicates active infection compared with prior exposure in a patient who has been treated and cured.  *See* Administrative Record at STND432-01589.

C.      Plaintiff's Claim History[4]

In December of 1997, plaintiff made a claim for long-term disability benefits as a result of Lyme disease and a co-infection with babesiosis involving the central nervous system. On January 2, 1998, defendant received a Long Term Disability Claim Employee's Statement from plaintiff stating she had become unable to work as a result of disability on October 10, 1997 and stating the Lyme disease she had contracted in 1989 had been suppressed and controlled with antibiotics from 1995 to 1997, but now prevented her from working at her occupation. Between January 13, 1998 and January 20, 1998, defendant also received Long Term Disability Claim Attending Physician's Statements from several of plaintiff's treating physicians stating her disability was caused by Lyme disease.

On February 6, 1998, defendant advised plaintiff that additional information was needed before a determination of her claim could be made. On March 2, 1998, Dr. Carl Vartian with Infectious Disease Consultants, P.A. in Houston, Texas conducted an independent medical examination of plaintiff and issued a report regarding his findings. In his report, Dr. Vartian stated there was no evidence that any of plaintiff's symptoms were due to Lyme disease. On March 11, 1998, defendant notified plaintiff it wanted to obtain more complete medical information and information from plaintiff's former employer before making a determination on her claim.

On April 13, 1998, defendant requested plaintiff to summarize in writing all professionals who had treated her since January 1, 1990, so it could complete a thorough investigation of her medical condition. On June 23, 1998, defendant advised plaintiff, through her attorney, that an

---

[4]This claim history encompasses the events involved in defendant's initial review of the claim and defendant's second administrative review of the claim following the dismissal of plaintiff's first lawsuit.

independent psychiatric evaluation was needed and that Dr. Vartian would be reviewing additional medical records.  After reviewing these additional records, Dr. Vartian provided an addendum to his former opinion, but his prior conclusion remained unchanged.  On July 23, 1998, Dr. Norman Miller, a psychiatrist and neurologist, conducted an examination of plaintiff and issued a report regarding his evaluation.  In his report, Dr. Miller concluded that plaintiff was suffering from major depression, chronic, and hypochondriasis, with poor insight.

On September 9, 1998, defendant advised plaintiff her claim for benefits had been approved but it appeared the twenty-four month mental disorder limitation on benefits might apply to her claim, and defendant was continuing to investigate the applicability of the limitation.  On January 15, 1999, defendant advised plaintiff that in its opinion the mental disorder limitation would apply but invited plaintiff to forward any additional information to support her contention that the limitation did not apply.  Plaintiff submitted additional information.

On March 9, 1999, defendant determined that the entire file should be sent for review by an independent specialist with Lyme disease experience.  Dr. Leonard Sigal conducted such an independent file review and concluded there was no proof plaintiff's debility was the result of Lyme disease.

On May 13, 1999, defendant notified plaintiff of its conclusion that plaintiff was not disabled by physical disease and that the mental disorder limitation did apply.  Defendant further notified plaintiff her file would be forwarded to its Quality Assurance Unit for independent review.  On September 24, 1999, defendant's Quality Assurance Unit confirmed the applicability of the mental disorder limitation to plaintiff's claim.  Plaintiff ceased to qualify for additional benefits after January 8, 2000.

On May 25, 2000, Dr. Nancy Fiedler performed an independent neuropsychologic evaluation of plaintiff at defendant's request.  In her report, Dr. Fiedler concluded that plaintiff's current neuropsychological test results reflect a decrease from her presumed premorbid level but noted that plaintiff's subjective complaints were out of proportion to her objective findings.  Dr. Fiedler further stated that based on her current evaluation that it was not possible to determine the extent to which psychologic factors contribute to plaintiff's physical complaints but that negating any possibility of a psychiatric factor to plaintiff's impairment would be negligent.

During defendant's second review of plaintiff's claim,[5] defendant requested Dr. Linda Toenniessen, a physician consultant who is a board certified psychiatrist, to review plaintiff's file. Dr. Toenniessen noted that she was concerned that plaintiff has a potentially life-threatening somatoform disorder and concluded that the diagnoses of depression and hypochondriasis indicated by Dr. Miller are reasonable.

Plaintiff's medical records were also reviewed by Dr. Elias Dickerman, a physician consultant who is a board certified neurologist.  Following his review of the materials, Dr. Dickerman concluded that there was a lack of specific findings that one would expect to see that would establish an organic brain disorder.  In light of Dr. Dickerman's conclusion, Dr. Toenniessen further concluded that Dr. Miller was correct in his diagnosis of a somatoform disorder and that plaintiff fits the main criteria for hypochondriasis without insight.

On March 17, 2003, defendant informed plaintiff of its conclusion that its decision to limit payment of benefits to twenty-four months under the Plan's mental disorder limitation was correct. Defendant further informed plaintiff that the claim file had been referred to the Quality Assurance

---

[5]See note 4 *supra* and section D *infra*.

Unit for an independent review.

While her claim was being reviewed by the Quality Assurance Unit, plaintiff submitted additional materials in support of her claim. On July 31, 2003, the Quality Assurance Unit informed plaintiff that it found that the correct decision was to limit her claim.

D.    History of Litigation

On June 9, 1999, plaintiff filed her first lawsuit regarding her long-term disability benefits in this Court. On September 14, 2000, this Court granted summary judgment in favor of defendant, holding that defendant's decision to apply the twenty-four month mental disorder limitation was not arbitrary and capricious. On June 12, 2002, the Tenth Circuit held that this Court no longer had subject matter jurisdiction after defendant agreed in December, 1999 to reopen the administrative record and reversed the judgment in favor of defendant and remanded the case with directions that it be dismissed.[6] On July 19, 2002, the Court dismissed the first lawsuit. On August 18, 2003, the instant action was filed.

II.    STANDARD OF REVIEW

"A court reviewing a challenge to a denial of employee benefits under 29 U.S.C. § 1132(a)(1)(B) applies an 'arbitrary and capricious' standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms." *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998) (internal citations omitted). The parties agree defendant had discretionary authority to determine eligibility for benefits.

---

[6]After the dismissal of the case, counsel for the parties agreed upon the material that would subsequently be reviewed for purposes of plaintiff's claim determination.

Thus, the proper standard of review in the case at bar is whether defendant's decision to apply the twenty-four month mental disorder limitation was arbitrary and capricious. However, when the plan administrator operates under an inherent conflict of interest, an additional reduction in deference is appropriate.[7] *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1006 (10th Cir. 2004).

> Under this less deferential standard, the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard. In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence. The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest.

*Id.* (internal citation omitted).

"Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker]. Substantial evidence requires more than a scintilla but less than a preponderance." *Sandoval v. Aetna Life and Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (internal quotations and citation omitted). "Substantiality of the evidence is based upon the record as a whole." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002). In determining whether the evidence in support of a plan administrator's decision is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Id.* (internal quotations and citations omitted).

---

[7]The parties agree there is an inherent conflict of interest.

III.     DISCUSSION

Having carefully reviewed the extensive administrative record, the Court finds defendant has satisfied its burden of demonstrating that its interpretation of the terms of the Plan is reasonable and that its application of those terms to plaintiff is supported by substantial evidence.  Accordingly, the Court finds defendant's decision to apply the twenty-four month mental disorder limitation was not arbitrary and capricious.

First, the two independent medical examinations of plaintiff conducted by Dr. Vartian and Dr. Miller, both qualified medical professionals, support defendant's decision to apply the mental disorder limitation.  In Dr. Vartian's March 2, 1998 report, he states plaintiff's November 5, 1997 Lyme disease tests can not be considered positive and the 1989 and 1990 results are suspect as well. Administrative Record at STND432-00402.  Dr. Vartian further states:

> It is clear to me that Dr. Schwob is absolutely convinced she has had Lyme disease for the past eleven years and that she continues to have symptoms due to the persistence of the Borrelia spirochetes. Although Lyme neuroborreliosis can result in significant neurologic symptoms, these respond to the usual 2-4 week course of intravenous Rocephin that is used for this condition.  In fact, I cannot be certain, given the data I have seen, that she *ever* had Lyme disease and I can safely say there is absolutely no evidence that any of her symptoms are due to this infection.  There is no basis in the medical literature to support the concept of a chronic infection that is refractory to *years* of antibiotic therapy. . . . I see no physical reason why she could not work, but, given her depressed mood and her fixation that she has some type of brain damage from Lyme disease, I would be hesitant to allow her to work as a pathologist without adequate supervision and review of her cases.

Administrative Record at STND432-00402-03 (emphasis in original).  Additionally, in Dr. Vartian's July 17, 1998 addendum, he states "it is clear that major depression is a significant feature of her illness," and concludes "[a]fter reviewing all these records, I am still of the opinion . . . that I see no

8

evidence to support chronic Lyme involvement of her brain as a cause for Dr. Schwob's symptoms. In addition, it is clear that she suffers from depression, and that this is a long-standing problem for her."  Administrative Record at STND432-00831-32.

In his report, Dr. Miller concludes:

> The principal diagnoses are major depression, chronic, and hypochondriasis, with poor insight. . . . The definitive diagnosis of Lyme disease remains uncertain. . . . The results of the MMPI-2 support somatic preoccupations as a dominant pattern in Dr. Schwob's psychological profile.  Her medical and psychiatric documents are replete with references and confirmation of misinterpretation of bodily symptoms which led to unnecessary treatments and impairment in her ability to maintain employment. . . .
> The claimant's depression, which was diagnosed as far back as 1990, persists to the present time. . . . Her symptoms of depression cause clinically significant impairment in occupational, social and other important areas of functioning.
> The claimant's hypochondriasis, which began in 1989, continues to the present time. . . . Her preoccupations with Lyme disease and its sequelae, particularly, neuro-psychiatric (cognitive), cause clinically significant impairment in occupational, social and other important areas of her life.
>
> *                    *                    *
>
> The severity of the claimant's functional limitations do not match the physiological pathology but do match the psychological pathology as described in the above review and in my interview.

Administrative Record at STND432-00790.

Second, Dr. Leonard H. Sigal conducted an independent review of plaintiff's medical records and concluded that there is no proof plaintiff's disability is the result of Lyme disease, active currently or in the past, but psychological, emotional and psychosocial factors "would seem to provide a much better explanation for her debility."  Administrative Record at STND432-01590-91. Third, Dr. Bradley J. Fancher, defendant's physician consultant, notes plaintiff's SPECT scan and MRI findings are entirely nonspecific and abnormal SPECT scans have been well documented in

psychiatric illness.  Administrative Record at STND432-00542; STND432-00815.

Fourth, Dr. Linda M. Toenniessen conducted an independent review of plaintiff's medical records and concluded that plaintiff "has a life-threatening condition which is, based on the totality of the medical record, psychiatric."  Administrative Record at STND432-05959.  In her February 26, 2003 report, Dr. Toenniessen further states:

>    Whether there is sufficient evidence for an encephalopathy or not, in Dr. Schwob's case, there are additional psychiatric symptoms and signs that are not easily explained, even if one agreed there were the "stable encephalopathy" proposed by Dr. Growbowski.  These signs include the claimant's insistent [sic] upon antibiotic treatment (even to the point of self administration of medications obtained overseas), her tolerance of fairly severe side effects (some requiring hospitalization), and her apparent inability or unwillingness to cooperate with conservative treatment (whether this would have been with Dr. Gardner's proposal of a placebo trial or Dr. Grabowski's more elaborate plan for monitoring for objective signs of deterioration, also proposed by doctors Coyle, Johnson, Gondwe and Burrascano).  These additional signs suggest possible psychiatric disorder, even if some of the claimant's presentation could be explained by a physical condition (such as a the [sic] "stable encephalopathy").
>
>    If we return to the diagnostic criteria for somatoform disorders and consider the possibility that not <u>all</u> of the claimant's presentation is explained by a physical disorder (regardless of the Lyme disease question), and consider each possible somatoform disorder in turn, Dr. Miller's diagnosis of hypochondriasis is reached.

Administrative Record at STND432-05953 (emphasis in original).

Fifth, Dr. Elias Dickerman conducted an independent review of plaintiff's medical records and concluded that there was a lack of specific findings that one would expect to see that would establish an organic brain disorder.  Administrative Record at STND432-05946.  Further,

>    Dr. Dickerman noted that Dr. Masters was the first physician to report positive test results for Lyme disease for Dr. Schwob.  The tests used at that time have been refined considerably, in part due to the over-diagnosis of the disease from false positive results.  Positive

results are based on the presence of active antibodies and therefore valid results should not fluctuate between negative and positive. Like syphilis, once exposed certain specific anti-bodies will consistently test positive, whether the disease itself continues to be active or not. Dr. Dickerman noted that the same bands did not consistently test positive, in other words, positive findings were based on different bands in different tests, Dr. Dickerman explained that, if valid, these result show that different anti-bodies were present at different times, which is improbable.

Dr. Dickerman said the lumbar puncture (LP) tests were most important and would be the most determinative of an organic disease process that caused debilitating encephalopathy from a CNS disorder. . . . He carefully reviewed the LP test results in the file and found them to be consistently negative, except for slightly elevated opening pressures. The opening pressures were not significant in this case. . . .

                    *                    *                    *

[Dr. Dickerman] noted that [plaintiff] reported early in her treatment that she believes she is vulnerable to infections from her pathology work and that documented fear of exposure and a belief that she is at risk, does put her at risk. This, however, is a psychiatric problem. He found the materials show a long-standing obsession with being sick which includes an insistence on continued treatment without sufficient specific evidence of an underlying disease process to continue such risky long term anti-biotic IV treatment. The lack of a well documented increase in protein content or cell content in the CSF (cerebral spinal fluid) at any time is evidence that an intracerebral process is unlikely and not probable to exist in this case.

Administrative Record at STND432-5947-48.

In addition to the opinions cited above by doctors obtained by defendant to examine plaintiff and/or review plaintiff's medical records, medical records from certain of plaintiff's treating physicians provide additional substantial support for defendant's decision. First, throughout plaintiff's medical records, various treating physicians have questioned and/or doubted the diagnosis of Lyme disease. *See e.g.* October 29, 1990 Mayo Clinic record, Administrative Record at STND432-00949-951 ("It was the opinion of the infectious disease people and rheumatologist who saw her that a diagnosis of Lyme's disease could not be made and that her symptomatology and

11

history were not consistent with this."); March 16, 1990 Dr. Robison record, Administrative Record at STND432-00893 ("It is clear to me that there are no objective neurologic signs at this time to indicate clinical evidence of recurrent Lyme. Indeed, since I have seen her, the findings have all been largely subjective."); January 26, 1998 Dr. Gondwe record, Administrative Record at STND432-00502 ("There is no telltale physical symptoms that this disease has really caused since she came to see me"); February 26, 1998 UIHC Consultation Form, Administrative Record at STND432-00308 ("Doubt Lyme disease").

Second, several of plaintiff's treating physicians have diagnosed plaintiff as suffering from depression. *See e.g.* September 26, 1990 Saint Mary's Health Center Discharge Summary, Administrative Record at STND432-00997-98 ("Major depression, recurrent"); January 16, 1998 Psychiatric Evaluation, Administrative Record at STND432-00728-29 (working diagnosis Major Depressive Disorder); February 5, 1998 letter from Dr. Grabowski, Administrative Record at STND432-00960-61[8] ("her cognitive inefficiency seems as likely to be attributable to depression as to mild cerebral dysfunction").

Additionally, statements made by various physicians support the conclusion plaintiff is suffering from hypochondriasis. *See e.g.* February 5, 1990 Office Visit Note, Administrative Record at STND432-00900 (plaintiff "remains obsessed with the problem of Lyme disease"); September 26, 1990 Discharge Summary, Administrative Record at STND432-00997 (plaintiff "made continuing delusions that she has Lyme disease").

The Court finds that the above-cited evidence is such evidence that a reasonable mind might

---

[8]This medical record also indicates the SPECT brain scan, dated November 17, 1997, indicates no specific abnormality.

accept as adequate to support the conclusion reached by defendant and that defendant, consequently, has met its burden of demonstrating that its decision is supported by substantial evidence. Therefore, the Court finds that defendant's conclusion that the twenty-four month mental disorder limitation applied to plaintiff's claim was not arbitrary and capricious.

IV.    CONCLUSION

Accordingly, for the reasons set forth above, the Court DENIES plaintiff's Motion for Summary Judgment [docket no. 19] and ORDERS that judgment be entered in favor of defendant.

**IT IS SO ORDERED this 20th day of March, 2006.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE